## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**JOSE M. TORRES-DIAZ**<br>Defendant. | Criminal No. 23-410 (FAB) |

### REPORT AND RECOMMENDATION

On August 19, 2022, Defendant José Torres-Díaz was convicted on two charges of possession of a firearm without a license in violation of Article 6.08 of Puerto Rico Law 168. Docket No. 22-1. On October 23, 2023, while on probation following his convictions, Defendant was travelling by car with other persons when unidentified individuals fired multiple bullets at the vehicle. Defendant received several shots. Three firearms were recovered at the scene. Docket Nos. 22, 29.[1] On November 1, 2023, Defendant was charged with violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearm and ammunition) and 18 U.S.C. §922(o) (possession of a machinegun). Docket No. 3.[2] Defendant filed a motion to dismiss the indictment, challenging the constitutionality of Sections 922(g)(1) and 922(o) premised on the United States Supreme Court's decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022). Docket No. 22. The Government opposed. Docket No. 29. Supplemental briefs were submitted at Docket Nos. 34 and 40. The motion was referred to the undersigned for a Report and Recommendation. Docket No. 24. After carefully considering the arguments set forth by the parties, the undersigned recommends that Defendant's motion to dismiss be **DENIED**.

---

[1] I take the factual allegations from the submissions of the parties and only for purposes of making a recommendation on Defendant's request for dismissal.

[2] Defendant is detained pending trial after the Court made a finding by clear and convincing evidence that no condition or combination of conditions of release could reasonably assure the safety of any other person and the community. See Docket No. 14.

## I.    Standard of Review

Under Rule 12(b)(1) of the Federal Rules of Criminal Procedure, "[a] party may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This includes motions to dismiss indictment by challenging the constitutionality of a statute. A facial challenge to a statute requires the defendant to establish that there are "no set of circumstances" under which the challenged statute would be valid. United States v. Rahimi, 602 U.S. ___, 144 S.Ct. 1889, 1898 (2024) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). To prevail on such a challenge, the Government only needs to establish that the challenged regulation "is constitutional in some of its applications". Id. To succeed in an as-applied constitutional challenge "the defendant must show that the statute is unconstitutional as it has been applied to the circumstances of his case.". United States v. Johnson, 2024 WL 199885, *1 (D. Mass. Jan. 18, 2024) (citing Hightower v. City of Boston, 693 F.3d 61, 71-72 (1st Cir. 2012)).

## II.    Applicable Law and Discussion

### A.    The Legal Landscape

Pursuant to the Second Amendment of the U.S. Constitution: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. At issue in this case are two regulations that Defendant alleges infringe on his right to keep and bear arms: the federal statute that prohibits a convicted felon from possessing a firearm or ammunition and the federal statute that prohibits the possession of a machinegun. Section 922(g)(1) provides that: "[i]t shall be unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). Section 922(o)(1) provides that: "[…] it shall be unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o).[3] Therefore, while Section 922(g)(1)'s prohibition applies only to a specific group—convicted felons—Section 922(o) is a general prohibition that applies to all.

---

[3] A "machinegun" means "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term

**United States v. Torres-Díaz**
**Criminal No. 23-410 (FAB)**
**Report and Recommendation**

I set the landscape by discussing the relevant decisions of the U.S. Supreme Court in chronological order. In 1939, the U.S. Supreme Court in United States v. Miller, 308 U.S. 174 (1939), held that the Second Amendment right to bear arms does not extend to the possession or use of a "shotgun having a barrel of less than eighteen inches in length." In 2008, the Supreme Court decided United States v. Heller, 554 U.S. 570 (2008). At issue in Heller was the constitutionality of a District of Columbia prohibition of the possession of handguns in the home. In rejecting a total ban to the possession of handguns in a home, the Supreme Court acknowledged that a handgun is a weapon used for self-defense. Id. at 628-635. The Supreme Court held that "the right of the people" in the Second Amendment is a reference to an individual right of all members of the general political community and not a subset. Id. at 580. It also noted that there is a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans. Id. at 581. In discussing the substance of the right— "to keep and bear Arms"— the Supreme Court expressed that *prima facie* it extends "to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. The Supreme Court in Heller rejected the argument that the Second Amendment right is limited to service in the military and expressed that the right applies "to weapons that were not specifically designed for military use and were not employed in a military capacity." Id. at 581, 589. Indeed, the Court read the decision in Miller to conclude that the Second Amendment does not extend to the possession of weapons not typically possessed by law abiding citizens for lawful purposes. Id. at 622-623, 625 ("Rather, it was that the *type of weapon at issue* was not eligible for Second Amendment protection: 'In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*.' […] *Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons.") (emphasis in the original). The Supreme Court in Heller also expressed that historical tradition supports

---

shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

prohibiting the carrying of "dangerous and unusual weapons." Id. at 627-628 (citations omitted). And that even though it could be argued that a ban of "weapons that are most useful in military service—M-16 rifles and the like" could represent a departure from the clause of the Second Amendment that makes reference to a *well-regulated Militia*, "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." Id. at 627-628. Lastly, the Supreme Court expressed: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-627.

Heller was followed by McDonald v. City of Chicago, 561 U.S. 742 (2010). The Supreme Court's decision in McDonald clarified that Second Amendment rights apply to the states under the Fourteenth Amendment. In so holding, the Supreme Court noted that the right to bear arms and to self-defense is a basic legal right that is deeply rooted in the Nation's history and tradition. Id. at 767-768. And that the due process clause of the Fourteenth Amendment made the Second Amendment right recognized in Heller— the right to possess a handgun in the home for the purpose of self-defense— applicable to the states. Id. at 791. The Supreme Court in McDonald reaffirmed the following: "It is important to keep in mind that *Heller,* […] recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." Id. at 786 (citing and quoting Heller, 554 U.S. at 626-627, internal citations omitted) (emphasis in the original).

Twelve years later came New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022). The inquiry in Bruen was whether a New York statute that required establishing special circumstances to obtain a license to open carry firearms was at odds with the right to keep

and bear arms in the Second Amendment. The Supreme Court held that the statute was unconstitutional. Id. at 39. As highlighted throughout the opinion, the petitioners in Bruen were two law-abiding citizens and the Supreme Court described the protections afforded in Heller and McDonald as protections of the right "of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." Id. at 8, 15. The Supreme Court set out a new analytical framework for any statute that regulates rights contemplated in the Second Amendment. To survive constitutional scrutiny, any such regulation must be consistent with the Nation's historical tradition of firearm regulation. Id. at 17. Bruen requires courts to apply two steps: (1) when the Second Amendment's plain text covers an individual's conduct, it should be deemed that the Constitution presumptively protects the conduct, and (2) the Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Id. at 24. But a "historical twin" is not necessary; a "historical analogue" suffices to pass constitutional muster. Id. at 30. In striking the New York statute, the Court held the following: the two law-abiding adult citizens challenging the New York statute were part of "the people" protected by the Second Amendment (id. at 31-32), the handguns that were the object of the statute are weapons commonly used today for self-defense (id. at 32), the right to "bear" arms includes the right to publicly carry firearms (id. at 32), and the American government has not broadly prohibited the open carry of commonly used firearms for personal defense nor has it required law-abiding citizens to demonstrate a "special need for self-protection distinguishable from that of the general community." (id. at 70) (citations omitted).

Bruen was followed by United States v. Rahimi, 144 S. Ct. 1889 (2024). Rahimi gave the Supreme Court an opportunity to evaluate the constitutionality of the federal statute that prohibits individuals subject to a domestic violence restraining order from possessing a firearm in 18 U.S.C. § 922(g)(8). The Supreme Court distinguished the statute at issue in Bruen from Section 922(g)(8) in two important respects: Section 922(g)(8) did not broadly restrict the rights to bear arms by the public generally and there is "ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." Id. at 1898, 1901. The Court stated that "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." Id. at 1901 (citing Heller 554 U.S. at 626). In holding that

5

Section 922(g)(8) passed constitutional muster, the Court stressed that the Bruen analysis does not require finding a regulation that is a "historical twin" to a regulation that now limits Second Amendment rights. Id. at 1901-1903. It concluded that, consistent with historical regulation, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." Id. at 1901. The Court in Rahimi closed by stressing that its analysis in Heller, McDonald, Bruen and Rahimi were not exhaustive of the "full scope of the Second Amendment," instructing instead that an independent analysis of each legislation that restricts Second Amendment rights will be necessary. Id. at 1903.

### B. Facial Challenge to 18 U.S.C. §922(g)(1)

Defendant relies on the two-step Bruen analysis and on his interpretation of Rahimi. But before proceeding to Bruen and Rahimi, a discussion of First Circuit case law is in order. Prior to Bruen, the First Circuit evaluated a challenge to Section 922(g)(1) in United States v. Torres-Rosario, 658 F.3d 110 (1st Cir. 2011). In Torres-Rosario, the First Circuit examined whether a conviction under Section 922(g)(1) should stand after the Supreme Court's decisions in Heller and McDonald. Id. at 112. In rejecting an as-applied challenge to the constitutionality of Section 922(g)(1), the First Circuit relied on the expressions of the Supreme Court in Heller and McDonald that those decisions were not intended to disturb "longstanding regulatory measures" as the prohibition on the possession of firearms by felons. Id. at 113. The First Circuit concluded its analysis by noting that even "[a]ssuming *arguendo* that the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the ban, drug dealing is not likely to be among them." Id. at 113.

In his submissions, Defendant foregoes discussion of the First Circuit's decision in Torres-Rosario, which binds this Court as a precedent that has not "unmistakably been cast into disrepute by supervening authority." Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004), abrogated on other grounds by Carson v. Makin, 596 U.S. 767 (2022). Indeed, courts in the First Circuit have followed the Torres-Rosario precedent in rejecting constitutional challenges to Section 922(g)(1). See e.g., Johnson, 2024 WL 199885 at *2 (rejecting facial challenge to 18 U.S.C. § 922(g)(1) and citing Torres-Rosario as binding precedent); United States v. Barnard, 704 F. Supp. 3d 259, 266-267 (D. Me. 2023); United States v. Vicente-Vázquez, 701 F. Supp. 3d 195, 199 (D.P.R. 2023); United States v. Fulcar, 701 F.Supp.3d 49, 54-55 (D. Mass. 2023); United

States v. Florentino, 701 F.Supp.3d 42, 44 (D. Mass. 2023); United States v. Giambro, 676 F.Supp.3d 9, 14 (D. Me. 2023); United States v. Belin, 2023 WL 2354900, at *1 (D. Mass. Mar. 2, 2023); United States v. Trinidad, 2022 WL 10067519, at *2 (D.P.R. Oct. 17, 2022). And most recently, in United States v. Langston, 110 F.4th 408 (1st Cir. 2024), in reviewing for clear error a conviction under Section 922(g)(1), the First Circuit expressed that the Supreme Court has not held that Section 922(g)(1) is unconstitutional and has reiterated that the prohibition of the possession of firearms by felons is presumably lawful. Id. at 419-420 (discussing *dicta* in Heller, McDonald, and Rahimi (and concurrent opinions in Bruen), that those decisions do not cast doubt on longstanding prohibitions as those in Section 922(g)(1)). Relying on Torres-Rosario, the First Circuit in Langston rejected the defendant's as-applied challenge to Section 922(g)(1) because it was not clear or obvious that he fell within a category of individuals with non-violent underlying convictions. Id. at 420.[4]

This brings us to the next issue. Defendant urges the Court not to give weight to the expressions of the Supreme Court in Heller, McDonald and Rahimi indicating that the decisions in those cases do not cast doubt on the longstanding prohibition of the possession of firearms by felons. And to disregard those expressions as non-binding *dicta*. Docket No. 22 at pp. 11-12. The Government relies on the very same *dicta* Defendant seeks to avoid. Docket No. 29 at p. 4. So has the First Circuit in Torres-Rosario, 658 F.3d at 113, and Langston, 110 F.4th at 419-420. And numerous courts in the First Circuit have followed suit. See e.g., United States v. Abel Baez-Pacheco, Crim. No. 22-233 (ADC), Report and Recommendation at Docket No. 26 pp. 10-11 (adopted on Nov. 10, 2022 at Docket No. 30); Vicente-Vázquez, 701 F. Supp. 3d at 199; United States v. Rosado-Alvarado, Crim. No. 23-336 (RAM) at Docket No. 37 pp. 8-9; Giambro, 676 F.Supp.3d 9 at 12-13; Belin, 2023 WL 2354900 at *1; Florentino, 701 F.Supp.3d at 44; United States v. Pringle, 2023 WL 7135176 *2-3 (D. Mass. Oct. 30, 2023); Barnard, 704 F.Supp.3d at 266-267. Further, the First Circuit has made it abundantly clear that "federal appellate courts are bound by the U.S. Supreme Court's considered *dicta* almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement." Cuevas v. United States, 778 F.3d 267, 272–73 (1st Cir. 2015) (citing

---

[4] A petition for certiorari was denied by the Supreme Court on November 18, 2024. 2024 WL 4805963.

McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)); see also Igartúa v. United States, 626 F.3d 592, 605 n. 15 (1st Cir. 2010) ("Carefully considered Supreme Court dicta, though not binding, 'must be accorded great weight and should be treated as authoritative.' Although the Supreme Court may ignore its own *dicta*, we are a lower court bound by the Supreme Court." (citations omitted)); United Nurses & Allied Pros. v. Nat'l Lab. Rels. Bd., 975 F.3d 34, 40-41 (1st Cir. 2020); United States v. Báez-Martínez, 950 F.3d 119, 132 (1st Cir. 2020). I thus reject Defendant's invitation to ignore that *dicta*. The Supreme Court's expressions in Heller, McDonald and Rahimi are of "recent vintage" and have not been "enfeebled by any subsequent statement"— those decisions do not cast doubt over regulatory measures that prohibit the possession of firearms by convicted felons.

I nonetheless proceed on Defendant's challenge. Defendant starts by arguing that, regardless of his status as a convicted felon, he is one of "the people" whose rights are guaranteed by the Second Amendment. Docket No. 22 at p. 8. Defendant advocates for the Court to follow Third and Fifth Circuit precedent to this end. Defendant then posits that, in applying the two-part test set forth in Bruen, a plain reading of Section 922(g)(1) shows that the statute regulates the conduct protected by the Second Amendment—Defendant's right to possess firearms and ammunitions. Id. at pp. 8-10. The Government counters by relying on expressions made in Heller, McDonald and Bruen to the effect that that the right to bear arms belongs to "law-abiding, responsible citizens." Docket No. 29 at p. 4.

While there is no dispute that the Supreme Court in Heller, McDonald, and Bruen repeated that the Second Amendment rights of "law-abiding citizens" were at issue, the facts available to the Supreme Court in those cases did not give the Court an opportunity to consider whether convicted felons were part of "the people" contemplated in the Second Amendment. And the Court in Heller did say that Second Amendment rights belong to all members of a political community and all Americans. Heller, 554 U.S. at 580-581 (citation omitted). There is also no binding First Circuit precedent on this very issue and the Sixth, Third, and Fifth Circuits have held that convicted felons are part of "the people" in the Second Amendment. See United States v Williams, 113 F.4th 637, 649-650 (6th Cir. 2024); United States v. Moore, 111 F.4th 266, 268-269 (3d Cir. 2024); United States v. Díaz, 116 F.4th 458, 466 (5th Cir. 2024). Other courts in the First Circuit have also deemed felons to be part of "the people". See e.g., Abel Baez-Pacheco, Crim. No. 22-233

(ADC) at Docket No. 26; United States v. Levasseur, 2023 WL 6623165, *2-5 (D. Me. Oct. 27, 2023); Fulcar, 701 F.Supp.3d at 55-56; Johnson, 2024 WL 199885 at *2. I follow in the steps of other courts and assume, without deciding, that Defendant is part of "the people" whose rights are protected under the Second Amendment. See e.g., Rosado-Alvarado, Crim. No. 23-336 (RAM) at Docket No. 37; Giambro, 676 F.Supp.3d at 13-14.

Defendant points to the Government's burden to establish the existence of historical analogues to justify the prohibition in Section 922(g)(1). The Government argues that "Section 922(g)(1) fits comfortably within the nation's longstanding tradition of disarming unvirtuous or dangerous citizens." Docket No. 29 at p. 5. The Government discusses the 1689 English Bill of Rights, laws that banned firearm possession by religious minorities and Native Americans, some colonies' prohibition of firearms by people who refused to declare an oath of loyalty, Thomas M. Cooley's 1868 treatise, Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, and statutes which precluded individuals convicted of crimes from serving on a jury or voting. Id. The applicable query requires that we consider "how and why the founding generation regulated firearm possession and determine whether the application of a modern regulation fits neatly within those principles." Williams, 113 F.4th at 648 (citing Rahimi, 144 S.Ct. at 1901, internal quotations omitted). The Government has carried its burden.

Defendant seeks to discount the 1689 English Bill of Rights by arguing that the Second Amendment was intended to grant an expanded right to bear arms and limited legislature power to strip those rights. But, as recently discussed by the Sixth and Eighth Circuits, the English Bill of Rights, which was the predecessor of the Second Amendment, allowed the English Crown and Parliament to determine which citizens could have arms, and to make general determinations of dangerousness to restrict access to arms for certain groups. Williams, 113 F.4th at 649-654; United States v. Jackson, 110 F.4th 1120, 1126 (8th Cir. 2024); see also Heller, 554 U.S. at 593 ("To be sure, it was an individual right not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament.") (citations omitted)); United States v. Carpio-León, 701 F.3d 974, 980 (4th Cir. 2012). This historical analogue is relevant to the analysis as it establishes that the predecessor of the Second Amendment contemplated a right to bear arms that could be restricted.

**United States v. Torres-Díaz**
**Criminal No. 23-410 (FAB)**
**Report and Recommendation**

Defendant next asks the Court to reject colonial era laws that demonstrate a tradition of disarming groups such as Native Americans, religious minorities, and those who refused to declare oath of loyalty as discriminatory and obviously unconstitutional today. But irrespective of the antiquated and discriminatory nature of the laws and of the fact that these would not pass constitutional muster today, the Bruen test calls for the Court to consider those laws to find historical analogues to the statute at issue today. As expressed by Hon. Judge Delgado Colón, Bruen "forces a public reckoning with the Second Amendment's history—one that often includes laws excluding socially marginalized individuals or groups from the full enjoyment of constitutional rights under pretenses that our current understanding of the Constitution may find repugnant. Requiring litigants and the courts to go spelunking through history in the search for comparable counterparts or analogues will result in uncomfortable confrontations with laws that reflect our forebearers' least commendable values. *Bruen* asks that courts nonetheless fit modern-day laws into Founding Era conceptions of (as in this case) race, religion, and allegiance— concepts whose understandings vary significantly today from that of the 18th and 19th centuries." United States v. Pierret-Mercedes, 2024 WL 1672034, at *25 (D.P.R. Apr. 18, 2024) (emphasis in the original); see also United States v. Trinidad-Nova, 671 F.Sup.3d 118, 123 n.3 (D.P.R. Apr. 25, 2023) (commenting that "Bruen step two puts the Court in the awkward position of using 'racist and xenophobic legislation of the past' as justification for the current limiting of arguable constitutional rights.") (citation omitted). Despite their discriminatory nature, these colonial statutes do demonstrate a tradition of disarming groups of individuals deemed dangerous or "unvirtuous". See United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009) (the founding generation made efforts to disarm "unvirtuous" individuals, such as convicted felons) (citation omitted); Williams, 113 F.4th at 654; Jackson, 110 F.4th at 1126; Carpio-León, 701 F.3d at 979–80 (citations omitted); United States v. Goins, 118 F.4th 794, 799-801 (6th Cir. 2024); see e.g., Vicente-Vázquez, 701 F. Supp. 3d 195 at 200 ("In the colonial era, Native Americans and religious minorities were prohibited from owning firearms. During the Revolutionary War, 'the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.'") (citations omitted); Levasseur, 2023 WL 6623165, at *7 (finding historical analogues in English practice of

disarming Catholics, the colonial discriminatory practice of disarming Native Americans, and the disarmament of Loyalists during the American Revolution).

Defendant also takes issue with the Government's use of failed state proposals to show a historical tradition of disarming certain groups. But as noted by the Fifth, Sixth, and Eighth Circuits, anti-federalist proposals reveal that ratifiers thought they could disarm dangerous individuals. The Court may look to these proposals to learn about the Nation's views and traditions with respect to firearm restrictions and to draw an analogy to restrictions today. Williams, 113 F.4th at 656; Jackson, 110 F.4th at 1127; United States v. Díaz, 116 F.4th 458, 470 (5th Cir. 2024) ("relying solely on unadopted proposals" could be insufficient but "taken together with the other evidence" […] "reveal that the right to bear arms at the time was not unlimited, and that the government could prevent people who had committed crimes or were 'quarrelsome' from accessing weapons." (citations omitted); see also Levasseur, 2023 WL 6623165, at *8 (proposed constitutional amendments in Pennsylvania, Massachusetts, and New Hampshire reveal that "the right to bear arms was understood to have limits").

Per the above, there are historical analogues to conclude that early Americans conceived that the right to bear arms in the Second Amendment could be restricted for certain groups. Williams, 113 F.4th at 656-57 (rejecting facial challenge to 922(g)(1) and conceiving that an as-applied challenge could prosper in certain circumstances); Jackson, 110 F.4th at 1127-28 (historical analysis supports conclusion that regulation may prohibit possession of firearms by convicted felons); Díaz, 116 F.4th at 470–71 (rejecting as-applied challenge to 922(g)(1) based, in part, on colonial statutes that authorized the forfeiture of weapons as punishment). Bruen does not require a historical twin. The Government has shown the existence of historical analogues to justify the restriction in Section 922(g)(1). See e.g. Johnson, 2024 WL 199885, at *3–4 (discussing same historical analogues and holding that such analogues suffice to find regulation constitutional under Bruen).

Defendant argues that the Supreme Court in Rahimi imposed six separate and distinct requirements, all which require specificity in the assessment and finding of threat, necessary to support a firearm prohibition consistent with the Second Amendment. According to Defendant's reading of Rahimi, for a statute to be found constitutional under Bruen, the (1) restricted individual must be a threat for a specific reason, (2) a court must have made a finding of the existence of

threat, (3) a threat must be determined to be credible or to be an actual threat, (4) threat must be violent to physical safety, (5) posed threat must be to another specific person, and (6) the resulting prohibition must be temporary. Docket No. 34 at pp. 5-6. Defendant then argues that because Section 922(g)(1) does not limit its firearm restriction to those "six salient features," it is unconstitutional. Id. at p. 8. The Supreme Court's decision in Rahimi was a narrow one: "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." Rahimi, 144 S.Ct. at 1903. Those were the specific circumstances for the Court in Rahimi to hold that Section 922(g)(8) survived a constitutional challenge. Nowhere does the Supreme Court in Rahimi impose those "six salient features" as requirements for the constitutionality of a firearm regulation. On the contrary, the Supreme Court in Rahimi stressed that its analysis was not exhaustive of the "full scope of the Second Amendment," instructing that an analysis under Bruen of each legislation that restricts Second Amendment rights would be necessary. Id. To this end, the Supreme Court in Rahimi reiterated the Bruen two-step analysis and underlined that the constitutionality of a firearm regulation does not depend on a historical twin and that courts could rely in analogous historical restrictions to find constitutionality. Defendant's reading of Rahimi is *at best* off mark. See e.g., Levasseur, 2024 WL 3358221 * 9 (rejecting Rahimi challenge to Section 922(g)(1) after denial of motion to dismiss under Bruen).

    C.    **Facial Challenge to 18 U.S.C. §922(o)**

Defendant argues that his right to possess automatic weapons is covered by the plain text of the Second Amendment. He recognizes that unless excluded from the "Arms" reference in the Second Amendment, it should be covered. Docket No. 22 at p. 12. He relies on the Supreme Court's expression in Heller that "arms" include all bearable arms even those that were not in existence at the time of the founding. The Government counters that pursuant to Heller, the Second Amendment does not protect weapons not in common use at the time of its passage, those that were not typically possessed by law-abiding citizens for lawful purposes, or those deemed "dangerous and unusual." Docket No. 29 at 9.

The Supreme Court in Heller took the opportunity to explain its decision in Miller. In Miller, two men were indicted for transporting an unregistered shotgun in violation of the National Firearms Act. The Supreme Court explained that "the *type of weapon at issue* [in Miller] was not

eligible for Second Amendment protection." Heller, 554 U.S. at 622 (emphasis in the original). Citing Miller, the Supreme Court stated "'[i]n the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*.'" Id. Heller expressed that such a limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. at 627.

Recent expressions of the First Circuit support the Government's position that the plain text of the Second Amendment does not protect the possession of machineguns. In Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38 (1st Cir. 2024),[5] the First Circuit discussed a Rhode Island statute that prohibited the possession of large capacity magazines capable of holding more than ten rounds of ammunition. The First Circuit relied on Heller, McDonald, and Bruen in its analysis. Id. at 43. Because the First Circuit found no directly on-point tradition on which to rely in examining whether the statutory ban at issue was consistent with the Nation's history and tradition, it employed analogical reasoning. Id. at 44. In considering "how" the regulation burdened a law-abiding citizen's right to armed self-defense, the First Circuit noted that there was no evidence that the banned long capacity magazines were necessary for self-defense. Id. at 45. It also relied on Miller and Section 922(o) to conclude that "historical tradition of regulating arms used for self-defense has tolerated burdens on the right that are certainly no less than the (at most) negligible burden of having to use more than one magazine to fire more than ten shots." Id. at 46. On the question of "why"—comparing the justification for the modern regulation with that of a historical analogue— the First Circuit expressed that bans are justified when the arms are considered "dangerous and unusual," and that weapons most useful in military service, such as M-16 rifles, may be banned. Id. at 48 (citing Section 922(o)). It noted that "[a]lthough the [Supreme] Court did not explicitly detail why such weapons are excepted from Second Amendment protection, one can infer the answer: They are more dangerous, and no more useful for self-defense, than a normal handgun or rifle." Id. at 48 (emphasis in the original). It thus concluded that the large capacity magazines banned by the Rhode Island statute fall "well within the realm

---

[5] A petition for certiorari was filed on August 6, 2024, Case No. 24-131.

13

of devices that have historically been prohibited once their danger became manifest." Id. at 50. The First Circuit held that the Rhode Island statute was constitutional under Bruen. Id. at 52 ("It is fair to assume that our founders were, by and large, rational. To conclude that the Second Amendment allows banning sawed-off shotguns, Bowie knives, and M-16s—but not LCMs used repeatedly to facilitate the murder of dozens of men, women, and children in minutes—would belie that assumption."). The Seventh Circuit's decision in Bevis v. City of Naperville, Illinois, 85 F.4th 1175, 1193 (7th Cir. 2023), is persuasive and supports a conclusion that the reference to "Arms" in the Second Amendment does not extend to machineguns. The Seventh Circuit in Bevis read Heller as holding that machineguns are not "bearable" arms and may thus be banned. Id. at 1193, 1197 (citing Heller, 554 U.S. at 624). The Court there concluded that the term "bearable arms" extends only to weapons commonly used for a lawful purpose, such as individual self-defense. Id. And that the weapons at issue in Bevis— semiautomatic weapons and large capacity magazines of more than 10 rounds— were not "Arms" under the Second Amendment because they were much more like machineguns than like firearms used for individual self-defense. Id. at 1195.

Defendant cites to Caetano v. Massachusetts, 577 U.S. 411 (2016), for the proposition that firearms well-suited for militia or military use are protected under the Second Amendment. Defendant invites the Court to make the inference that, if possession of stun guns well-suited for militia or military use are protected under the Second Amendment, so should be the possession of machineguns. Docket No. 22 at 13-19. But Defendant unreasonably stretches the Supreme Court's holding in Caetano. In Caetano, the Supreme Court reviewed the decision of the Supreme Judicial Court of Massachusetts that upheld a Massachusetts law prohibiting the possession of stun guns. Id. at 16-17. The Supreme Court examined the reasons given by the court to conclude that stun guns were not protected by the Second Amendment. In so doing, the Supreme Court held that, pursuant to Heller, (1) the Second Amendment could extend to arms that were not in existence at the time of the founding, (2) the Second Amendment did not exclude firearms of "modern invention" (termed "unusual" by the Supreme Judicial Court of Massachusetts), and, (3) protection under the Second Amendment was not limited to firearms readily adaptable to use in the military. Caetano, 577 U.S. at 411-12. The Court in Caetano remanded the case for further proceedings consistent with its opinion. Id. That is, Caetano stands for the proposition that stun guns could not be exempted from Second Amendment protection for being a modern invention or *unusual*, or for

not being readily adaptable for use in the military. Caetano does not stand for the proposition that stun guns if well-suited for militia or military, and inferentially, machineguns, are protected under the Second Amendment.

Defendant also argues that Heller did not hold that automatic firearms are "dangerous and unusual" and that, to the extent that machineguns are prevalent in American society, these are not "unusual". Docket No. 22 at 19. The holding in Heller has been explained above. Certainly, it was not that machineguns are "dangerous and unusual," as the possession of machineguns was not the issue in Heller. But we look to Heller to learn that, according to the Supreme Court, there is a historical tradition of prohibiting "dangerous and unusual" weapons and that firearms such as "M-16 rifles and the like" are examples of such weapons. Defendant's argument that machineguns are not "unusual" because of their prevalence in American society has been rejected by the First Circuit. Ocean State Tactical, 95 F.4th at 50-51. "While the Supreme Court has indeed identified a 'historical tradition of prohibiting the carrying of dangerous and unusual weapons,' it has not held that states may permissibly regulate only unusual weapons. Nor has it intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual'". Id. at 50-51 (ownership rates of weapons not the metric for "unusual") (citation omitted).

Defendant cites to Bruen to argue that "dangerous and unusual" weapons may only be restricted when used to "terrorize the people" and not when these are merely possessed. Docket No. 22 at 20. Indeed, in discussing colonial statutes, the court in Bruen expressed that those statutes "codified the existing common-law offense of bearing arms to terrorize the people." Bruen, 597 U.S. a 47. And that, accordingly, such a historical prohibition could not provide the basis to restrict the public carry of handguns commonly used today for self-defense. Id. But the Bruen Court did not intimate that only dangerous and unusual weapons used to terrorize could be restricted. It merely held that those colonial statutes were insufficient to establish a tradition of restricting the public carry of handguns used for self-defense. Not more.

In sum, per the Supreme Court's expressions in Heller and those of the First Circuit, M-16 rifles and "the like" are "dangerous and unusual" and may be banned. The conduct regulated in

Section 922(o)—possession of machineguns—is not included in the plain text of the Second Amendment.[6]

### D. As-Applied Challenges to Sections 922(g)(1) and 922(o)

Defendant argues that the statutes are unconstitutional as applied to him because his underlying convictions were not for violent conduct. Defendant fails to acknowledge, however, that he was on probation when he incurred in the new criminal conduct that gave rise to the charges in this case and that the illegal possession of firearms is not a "tame and technical" felony.

As discussed, the First Circuit's decision in Torres-Rosario is binding on the Court. In Torres-Rosario, the First Circuit relied on the expressions of the Supreme Court in Heller and McDonald that those decisions were not intended to disturb "longstanding measures" as the prohibition on the possession of firearms by felons and concluded that a defendant with a prior conviction for drug dealing would be unable to prevail in an as-applied challenge. Id. at 113. This decision tells us that the applicable analysis in an as-applied challenge is one of dangerousness with a focus on the characteristics of the individual, including his past convictions. See Williams, 113 F.4th at 658, 660 (we should consider a defendant's entire criminal record (not just prior felony convictions) when assessing dangerousness).

As recognized by the Supreme Court in Morrisey v. Brewer, 408 U.S. 471, 481-482 (1972), inherent in the release of defendants on parole is the recognition there "there is a risk that they will not be able to live in society without committing additional antisocial acts." Id. at 483. As such, individuals who are on parole enjoy a conditional liberty and are subject to restrictions that do not apply to other citizens. This also applies to defendants serving a sentence of probation. United States v. Knights, 534 U.S. 112, 119 (2001). "Inherent in the very nature of probation is that probationers 'do not enjoy 'the absolute liberty to which every citizen is entitled.''" Id. (citing Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) and quoting Morrisey, 408 U.S. at 480)). Defendant in this case was bound by the conditions of probation when he allegedly violated Sections 922(g)(1) and 922(o). "As the Court explained [in Rahimi], early American surety and

---

[6] Defendant cites to United States v. Morgan, 2024 WL 3936767, at *5 (D. Kan. Aug. 26, 2024). But the court in Morgan rejected defendant's facial challenge to Section 922(o). The Morgan Court noted that the definition of a "machinegun" is extremely broad and encompasses certain weapons, such as an aircraft mounted gun, that would not constitute a "bearable arm" under the Second Amendment. Morgan, 2024 WL 3936767, at *2. The decision is Morgan also supports a rejection of Defendant's facial challenge to Section 922(o).

affray laws establish the principle that '[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.' […] Taken together, the early American forfeiture laws—which required forfeiting property in general and arms in particular— likewise yield the principle that a convict may be disarmed while he completes his sentence and reintegrates into society." Moore, 111 F.4th at 272 (Section 922(g)(1) could be validly applied to a defendant on supervised release). Consistent with this premise, courts have consistently rejected as-applied challenges to Section 922(g)(1) by defendants who were on probation when they committed the offense. See e.g., Williams, 113 F.4th at 660-662 (rejecting as applied challenge of defendant on probation); Goins, 2024 WL 4441462 (defendant charged under 922(g)(1) while on probation for public intoxication, driving suspended license, driving under the influence and court reject as-applied challenge); United States v. Gay, 98 F.4th 843, 846-847 (7th Cir 2024) (rejecting as applied challenge of convicted felon who committed 922(g)(1) offense while on parole). Adding to the fact that Defendant was on probation is that Defendant's prior convictions are for the illegal possession of firearms. Courts in the First Circuit have rejected Section 922(g)(1) as-applied challenges after holding that prior violations to firearms laws are not the potentially "tame and technical" felonies contemplated in Torres-Rosario. See e.g., Giambro, 676 F.Supp.3d at 14-15 (unlawful possession of firearm as underlying conviction); Pringle, 2023 WL 7135176 *2-3 (illegal firearm activity found to be linked to violence even if it does not directly involve violent acts); Johnson, 2024 WL 199885 *4 (previous firearms laws violations); Florentino, 701 F.Supp.3d at 44 (convicted gun trafficker).

The rejection of an as-applied challenge to Section 922(g)(1) inherently includes a rejection of an as-applied challenge to Section 922(o)— Defendant, as a convicted felon prohibited from the possession of a firearm, cannot succeed in an as-applied challenge of the statute that prohibits him from possessing any other type of firearm (including a machinegun). Nonetheless, I address Defendant's request that I follow the footsteps of the District Court in Kansas in United States v. Morgan, 2024 WL 3936767, at *5 (D. Kan. Aug. 26, 2024). The Court in that case granted Defendant's as-applied challenge to Section 922(o). After rejecting a facial challenge to the statute, the Morgan Court found that, because the machineguns possessed by the defendant in that case could be carried by hand, these were by definition "bearable arms" under the Second Amendment. Id. at *2. Morgan rejected the expressions made in Heller pertaining to the exclusion of "dangerous

and unusual" weapons from the plain text of "bearable arms" as *dicta* and because it deemed those expressions to be contrary to its holding that arms that did not exist at the country's founding could be covered by the Second Amendment. Id. In applying the second step of the Bruen analysis, the Court in Morgan held that the Government failed to establish a historical analogue that could justify the prohibition of the possession of machineguns, especially because it found that the machineguns possessed by the defendant in that case were not "unusual" as "[t]here are over 740,000 legally registered machineguns in the United States today."[7] Id. at 4.

The decision in Morgan is currently on appeal before the Tenth Circuit in Appeal No. 24-3141 and is at odds with the expressions of the First Circuit in Ocean State Tactical. The analysis proposed by the Court in Morgan would require an independent assessment of the types of machineguns possessed by the defendant (of the physical attributes of that weapon (i.e., if the weapon could be carried by hand or otherwise)), as opposed to a general assessment of whether the weapon is "dangerous and unusual" as described by the Supreme Court in Heller. As rightfully argued by the Government, if we are to look at persuasive authority, we should look to courts in our District. See United States v. Berríos-Aquino, 2024 WL 1468488, *5 (D.P.R., April 4, 2024) (citing Heller to conclude that the Second Amendment does not protect weapons not typically possessed by law-abiding citizens for lawful purposes and concurring with significant persuasive authority of Supreme Court *dicta* and the decisions issued by sister courts; denying motion to dismiss Section 922(o) charge).

### III.  Conclusion

For the reasons discussed above, Defendant's motion to dismiss should be **DENIED.**

**IT IS SO RECOMMENDED.**

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the Report and Recommendation is a waiver of the right to review by the District Judge and of

---

[7] As discussed, the First Circuit in Ocean State Tactical declined to endorse the idea that the sole measure of whether a weapon is "unusual" is the prevalence of the weapon in society. Id. at 50-51.

appellate review. <u>Thomas v. Arn</u>, 474 U.S. 140, 154-155 (1985); <u>Davet v. Maccorone</u>, 973 F.2d 22, 30-31 (1st Cir. 1992).

In San Juan, Puerto Rico, this 22nd day of November 2024.

<u>s/Giselle López-Soler</u>
GISELLE LÓPEZ-SOLER
United States Magistrate Judge
